# EXHIBIT B

Doc
00314935   Bk
OR   Vol
1236   Pg
138

# CANADIAN RIVER MINERAL BOUNDARY AGREEMENT
## FOR
## WESTERN HUTCHINSON COUNTY, TEXAS

This Canadian River Mineral Boundary Agreement for Western Hutchinson County, Texas ("Agreement") is by and between the State of Texas, acting by and through Jerry Patterson in his official capacity as Commissioner of the General Land Office ("**State**"), J.M. Huber Corporation ("**Huber**"), Jaten Oil Company ("**Jaten**"), Edward L. Morris ("**Morris**"), and certain other persons and parties who may join herein by way of ratification, as hereinafter provided.

## R E C I T A L S

Controversies have arisen concerning the location of the boundary of the Canadian River (the "**River**") in Hutchinson County, Texas, below Sanford Dam and Lake Meredith. The State is the owner of the bed of navigable streams in the State of Texas, including the Canadian River. Certain owners of lands and interests in lands adjacent to the River have asserted claims that the boundaries of the bed of the River adjacent to their lands have changed by reason of the construction and operation of Sanford Dam at Lake Meredith and other changes in the flow of the River. Morris is the owner of interests in the oil, gas and mineral estate in lands adjacent to the River; Morris' mineral interests are subject to certain oil and gas leases, including an Oil and Gas Lease dated March 1, 1950, to Jaten, recorded in Volume 134, page 93 of the Public Records of Hutchinson County, Texas (the "**Jaten Lease**"). Jaten also has interests in the oil, gas and mineral estate in lands adjacent to the River under various other instruments and agreements. Jaten, Morris, and any other owner of an oil, gas or mineral interest (including a leasehold interest) in lands adjacent to the River

Doc          Bk      Vol      Pg
00314935  OR     1236    139

and who hereafter joins in this Agreement by ratification, as hereinafter provided, are hereafter referred to as "Riparian Owners."

Huber is the original lessee in two Oil and Gas Leases granted by the State covering lands within the bed of the River in Hutchinson County, Texas, known as **State Lease A** and **State Lease B,** and sometimes herein collectively referred to as the **"Riverbed Leases",** more particularly described in **Exhibit A.** A portion of State Lease A covers lands above (upstream from) Sanford Dam, and a portion of State Lease A covers lands below the dam. All of State Lease B covers lands below the dam. Huber has assigned portions of the leasehold estate in the Riverbed Leases to others. Huber and any other owner of a leasehold estate in the Riverbed Leases who hereafter joins in this Agreement by ratification, as hereinafter provided, are hereafter collectively referred to as **"State Lessees".** Huber and its assignees operate numerous oil and gas wells on the Riverbed Leases.

The State, Huber, Jaten and Morris wish to resolve all disputes among them as to the boundary of their mineral estates between the bed of the River and the lands adjacent to the River. The State, Huber, Jaten and Morris also wish to establish a framework for settlement so that other State Lessees and other Riparian Owners may elect to join in this Agreement upon the same terms and conditions. This Agreement therefore constitutes a settlement agreement among the named parties hereto, and also an offer by the State, Huber, Jaten and Morris to other State Lessees and other Riparian Owners to settle the boundaries of their mineral estate in a similar manner.

NOW, THEREFORE, this Agreement is made as of the Effective Date as follows:

1.      Term. This Agreement shall be for a primary term beginning on January 1, 2002 (the "Effective Date") and ending at midnight on December 31, 2050, and continuing thereafter for so

long as the Sanford Dam or its replacement is operable and continues to impede the natural flow of

the River. The Sanford Dam shall be deemed to have ceased impeding the natural flow of the River

if the State determines, acting in good faith, that the dam has not reduced the natural flow of the

River immediately below the dam by at least ten percent (10%) during any consecutive twenty-four-

month period. Upon the expiration of the primary term of this Agreement, if the Sanford Dam no

longer impedes the natural flow of the River, this Agreement shall terminate. If the Sanford Dam

shall cease to impede the natural flow of the River after the expiration of the primary term, this

Agreement shall terminate as of midnight on December 31 in the year in which such event shall first

occur. To establish the date of termination of record, the State shall place an affidavit of record by

the Commissioner of the General Land Office (or if that position no longer exists, by the State

official succeeding to the rights and duties of the Commissioner) in the Public Records of

Hutchinson County, Texas, and in the permanent records of the General Land Office, specifying the

date of termination of this Agreement, and such affidavit shall be binding upon all of the parties

hereto. Notwithstanding the termination of this Agreement, the rights and duties of the parties prior

to the date of termination shall be governed by this Agreement.

   2.   Replacement of Riverbed Leases By Amended State Lease. A part of State Lease A,

and all of State Lease B, shall be replaced, effective as of January 1, 2002, as to the interests of

Huber and any other State Lessee who ratifies this Agreement, by a lease in the form of the lease

attached hereto as **Exhibit B**, as to the lands described therein, which is referred to herein as the

"**Amended State Lease**." The State shall deliver the Amended State Lease to Huber as a

replacement lease in substitution for State Leases A and B, but only as to the lands described in the

Amended State Lease, and only as to the interest of Huber and any State Lessees who ratify this

Agreement. From and after the delivery and acceptance of the Amended State Lease and as of January 1, 2002, State Lease A and State Lease B shall be of no further force and effect as to the lands described in the Amended State Lease as to the interest of Huber and any State Lessees who ratify this Agreement. As to the interests of any other owners of a leasehold interest in State Lease A or State Lease B who do not ratify this Agreement, such leases shall remain in effect in accordance with their terms. As to the portion of State Lease A which lies beneath Sanford Dam and upstream of Sanford Dam and which is owned by Huber, Huber and the State shall enter into an amendment of State Lease A, in the form attached hereto as **Exhibit C**, revising the description of the lands covered thereby so that said Lease covers only the lands described in Exhibit C. There shall be no break in ownership or the right to possession, and neither any Riparian Owner nor the State may contend that the Amended State Lease or the Riverbed Leases terminated, or that any State Lessee waived or lost any of its rights in complying or attempting in good faith to comply with this Agreement to partially substitute the Amended State Lease for the Riverbed Leases as to the lands described in the Amended State Lease. If lands included in the Amended State Lease have been subjected to or burdened by other agreements encumbering State Lease A or State Lease B, and such agreements are still valid and in force and effect, the Amended State Lease shall be substituted automatically for State Lease A and State Lease B in such agreements.

3. <u>Agreed Riverbed</u>. The lands described in the Amended State Lease are herein called the "**Agreed Riverbed.**" Among and as between the parties hereto, it is agreed that the common boundary between the mineral interests of Riparian Owners and the State shall be the boundary of the Agreed Riverbed. For the term of this Agreement, as to the lands included in the Amended State Lease, it is agreed that:

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                    Page 4

208

(1) the River is a navigable stream under the laws of the State of Texas;

(2) the State owns the minerals in the Agreed Riverbed subject only to the riparian rights of Riparian Owners, the Riverbed Leases, the Amended State Lease, and such other rights-of-way, easements or other grants from the State as may now appear of record in Hutchinson County, Texas;

(3) the Riparian Owners own the minerals within their lands to the boundary of the Agreed Riverbed, subject to the rights of Jaten and its assignees under the Jaten Lease, the rights of any other mineral lessee of the Riparian Owners, and such other rights-of-way, easements or other grants from the Riparian Owners as may now appear of record in Hutchinson County, Texas;

(4) the "Centerline" of the Agreed Riverbed shall be along a line more particularly described by metes and bounds on **Exhibit D**, but generally described by a centerline from the eastern base of the Sanford Dam extending eastward to approximately the eastern boundaries of Section 16, Block 47, and Section 58, Block 46, all in H&TC Survey, Hutchinson County, Texas;

(5) the boundaries of the mineral estate in the Agreed Riverbed ("**Agreed Banks**") are fixed (without regard to the actual course or channel of the River or future changes in the actual course or channel of the River) according to the description of the Agreed Riverbed for the term of this Agreement; and

(6) if the State later determines that there is an error or mistake in the nature of a scrivener's error or a mechanical or mathematical error in locating, calculating, or describing the Centerline of the Agreed Riverbed, as shown on Exhibit D, or the allocation of the

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                    Page 5

Compensatory Royalty Pool, as shown on **Exhibit E**, the State may unilaterally correct such error by affidavits of record executed by the Commissioner of the General Land Office (or if that position no longer exists, by the State official succeeding to the rights and duties of the Commissioner) in the Public Records of Hutchinson County, Texas, and such affidavits shall be binding upon all of the parties hereto.

Each party hereto hereby grants, transfers and conveys to the other parties such interests in the mineral and leasehold estates in lands within and adjacent to the bed of the River as are necessary to accomplish the purposes and intent of this Agreement, for the term and subject to the terms and conditions of this Agreement.

4.     Mineral Rights. A **"Riparian Section"** means a section of land bounded on any side by the Agreed Riverbed and included among those Riparian Sections listed in Exhibit B. If the mineral ownership of a Riparian Section is not uniform, so that the mineral ownership in a portion of the Riparian Section not contiguous to the Agreed Riverbed is different from the mineral ownership in the portion of the section contiguous to the Agreed Riverbed, then the portion of the section not contiguous to the Agreed Riverbed shall not be considered part of the Riparian Section for purposes of this Agreement. A **"Riparian Tract"** means a tract of land contiguous to the Agreed Riverbed and included in a Riparian Section and in which mineral ownership is uniform throughout the tract. As of the Effective Date, the boundary of the mineral estate of a Riparian Owner who owns a mineral interest in a Riparian Tract on the bank of the River shall, as between the Riparian Owner and the State (and State Lessees), be the Agreed Bank. If, as to any such Riparian Tract, the mineral estate shall be owned in undivided interests, and one or more of the undivided mineral estate owners shall fail to join in this Agreement, the parties to this Agreement shall treat the State (and the State

Doc                BK        Vol        Pg
00314935        OR        1236        144

Lessees) as the lawful owner of the non-joining owner's interest in the mineral estate in the Agreed

Riverbed, unless and until a court of competent jurisdiction in a judgment binding upon the State

finally determines otherwise.

5.    Compensatory Royalty.    Notwithstanding the royalty provisions specified in the

Amended State Lease, a portion of the royalty proceeds otherwise payable to the State and remaining

after first deducting any applicable severance tax, production tax, and any other taxes, fees and

charges levied or assessed on the production of oil or gas at the wellhead, shall be designated as

"**Compensatory Royalty**" and shall be deducted from the State's royalty.    Compensatory Royalty

shall be payable into the Compensatory Royalty Pool as provided in this Agreement.    The allocation

of the royalty shall be as follows:

| Beginning | State Royalty | Compensatory Royalty | Total Royalty |
|---|---|---|---|
| January 1, 2002 | 11.375% | 1.125% | 12.50% |
| January 1, 2003 | 10.250% | 2.250% | 12.50% |
| January 1, 2004 | 9.125% | 3.375% | 12.50% |
| January 1, 2005 | 8.000% | 4.500% | 12.50% |
| January 1, 2006 | 6.875% | 5.625% | 12.50% |
| January 1, 2007 | 5.750% | 6.750% | 12.50% |
| January 1, 2008 | 4.625% | 7.875% | 12.50% |
| January 1, 2009 | 3.500% | 9.000% | 12.50% |

The percentages shown are a percentage of 8/8ths of production upon which royalty is payable as

provided in the Amended State Lease.    The royalty payable to the State together with the

Compensatory Royalty payable in any one year shall always equal 12.50% of 8/8ths of production.

From and after January 1, 2009, the State's share of the royalty otherwise payable under the

Amended State Lease shall remain fixed at 3.50% of production and the amount payable into the

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                        Page 7

Doc
00314935    Bk
OR    Vol
1236    Pg
145

Compensatory Royalty Pool shall remain fixed at 9.00% of production, which together equal 12.5%

of production, or the entire royalty payable under the Amended State Lease.

6.    Excess Royalty.  In addition to the one-eighth royalty provided in the Amended State

Lease, the royalty payable by the State Lessees for production from the Amended State Lease shall

be increased each year in accordance with the following schedule, and the increase or "**Excess**

**Royalty**" remaining (after first deducting any applicable severance tax, production tax, and any other

taxes, fees, and charges levied or assessed on the production of oil or gas at the wellhead) shall be

payable into the Compensatory Royalty Pool as provided in this Agreement.  The royalty to be

payable as Excess Royalty (subject to adjustment as provided in paragraph 12(c)) shall be as follows:

| Beginning | State Royalty and Compensatory Royalty | Excess Royalty | Total Royalty |
|---|---|---|---|
| January 1, 2002 | 12.50% | 1.25% | 13.75% |
| January 1, 2003 | 12.50% | 2.50% | 15.00% |
| January 1, 2004 | 12.50% | 3.75% | 16.25% |
| January 1, 2005 | 12.50% | 5.00% | 17.50% |
| January 1, 2006 | 12.50% | 6.25% | 18.75% |
| January 1, 2007 | 12.50% | 7.50% | 20.00% |
| January 1, 2008 | 12.50% | 8.75% | 21.25% |
| January 1, 2009 | 12.50% | 10.00% | 22.50% |
| January 1, 2010 | 12.50% | 11.25% | 23.75% |
| January 1, 2011 | 12.50% | 12.50% | 25.00% |

The percentages shown are a percentage of 8/8ths of production on which royalty is payable as

provided in the Amended State Lease. From and after January 1, 2011, the Excess Royalty payable

into the Compensatory Royalty Pool shall remain fixed at 12.50% of production. The burden on the

State Lessees under the Amended State Lease to pay the Excess Royalty is in addition to the one-

eighth royalty provided in the Amended State Lease, so that the total lease royalty burden on the

Doc          Bk      Vol     Pg
00314935     OR      1236    146

State Lessees effectively increases 1.25% each year over time until the total lease royalty burden reaches 25.00%, and is capped at 25.00%, beginning January 1, 2011.

7.     Compensatory Royalty Pool.  The Compensatory Royalty and the Excess Royalty payable under this Agreement shall be collected and paid into a **Compensatory Royalty Pool** to be commingled and administered by the **Pool Administrator** in accordance with the terms of this Agreement.

8.     Distributions From and Administration of Compensatory Royalty Pool.

(a)    General.  The right of any person or party to share in the Compensatory Royalty Pool is only a right to share in proceeds if, as and when delivered into the Compensatory Royalty Pool, and such right expressly does not include any rights in the production from which such proceeds may be derived.  The joinder of any party to this Agreement, other than the State and the State Lessees, shall not be required for any sale of production from the Amended State Lease to any purchaser, and no such purchaser shall be under any duty of inquiry as to the distribution or proper allocation of such proceeds under this Agreement.  The Pool Administrator shall collect, hold and distribute the funds in the Compensatory Royalty Pool in accordance with the terms of this Agreement.  Collections of Compensatory Royalty and Excess Royalty shall be monthly in accordance with the usual practices and customs in the industry applicable to the payment of royalty generally.  The Compensatory Royalty Pool shall be maintained and held in a separate account in the name of the Pool Administrator, in a federally insured financial institution, for the benefit of the persons and parties entitled to distributions as herein provided.  Interest payable on the funds in the Compensatory Royalty Pool, if any, shall be solely for the benefit of the Pool

Administrator, and no other person or party shall have any right or claim to interest on any funds in the Compensatory Royalty Pool, provided the funds in the Compensatory Royalty Pool are paid out timely in accordance with the terms of this Agreement. Distributions out of the Compensatory Royalty Pool shall be made annually, within sixty days after the end of each calendar year, to the persons or parties entitled thereto as of December 31 of each calendar year in accordance with the books and records and the division and transfer orders of the Pool Administrator. The Pool Administrator shall make the first payments hereunder based on the persons or parties entitled thereto as of December 31, 2004, retroactive to the Effective Date and disregarding any transfers of interests between the Effective Date and December 31, 2004. If the funds on hand are insufficient to make the payments due, the Pool Administrator may withhold and suspend all payments to the overpaid party or parties until the account is in balance and adequate funds are available to make a complete distribution. Any funds remaining in the Compensatory Royalty Pool after the annual distribution and the payment of interest proceeds to the Pool Administrator shall be payable one-half to the State and one-half to the Pool Administrator, so that there is a zero balance in the Compensatory Royalty Pool as of December 31 of each calendar year. The portion of the remaining funds paid out to the State shall be deemed to be part of the royalty interest proceeds payable to the State as the State's share of production proceeds in its capacity as the royalty owner in the Amended State Lease, but the State shall have no right or claim of reimbursement against any person or party for any severance tax, production tax, or other taxes, fees or charges levied or assessed on the production of oil or gas at the wellhead previously paid and attributable to such production. The portion of the remaining funds paid out to the Pool

Administrator shall be deemed to be part of the working interest proceeds payable to the Pool

Administrator as the Pool Administrator's share of production proceeds in its capacity as a

working interest owner in the Amended State Lease.

(b)    <u>Division and Transfer Orders</u>. The State is not required to sign or deliver any

Division or Transfer Order. No person or party shall have any interest in or right to any

portion of the Compensatory Royalty Pool unless (1) they are a party to this Agreement;

(2) except for the State, they have duly executed and provided to the Pool Administrator a

Division Order or Transfer Order in the form of **Exhibit F** or **Exhibit G** as appropriate;

(3) there is no controversy or contest as to the interest claimed; and (4) the Pool

Administrator is reasonably satisfied as to the ownership and title of the interest claimed.

Notwithstanding Texas Natural Resources Code § 91.402(c)(1) and § 91.402(e) and other

statutory provisions having application to division orders and transfer orders generally,

Exhibit F and Exhibit G are expressly included in this Agreement, and to the extent that the

form, operation, or construction of such orders might vary from such statutes, this Agreement

and Exhibit F and Exhibit G shall control and are a condition to the right to payment. To the

extent necessary, and as may be permitted by law, any party executing a division or transfer

order in the form of Exhibit F or Exhibit G expressly waives any statutory rights generally

applicable to division and transfer orders which are in conflict or inconsistent with this

Agreement, Exhibit F or Exhibit G.

(c)    <u>Title</u>. The Pool Administrator may call for a title opinion prepared by a

licensed Texas attorney as to each Riparian Tract, or, at the Pool Administrator's election,

if the cumulative interest claimed as to a particular tract is 100% or less, the Pool

Administrator may elect to waive further proof of title and make payment in accordance with the interests claimed. If ten or more persons or parties become entitled to payment as to any single Riparian Section, the Pool Administrator may withhold payment as to that Riparian Section unless and until furnished with a recordable instrument executed by all such persons or parties designating an agent to receive payment for all. The Pool Administrator may also require and elect to rely upon 100% indemnifying Division Orders executed by the lessee(s) of a Riparian Tract who have ratified this Agreement and who have the apparent exclusive right to produce oil and gas from the Riparian Tract. In either event, persons or parties whose interest in the Riparian Tract is subject to an agency agreement or lease shall look solely to their agent(s) or lessee(s) for their share of the Compensatory Royalty Pool, the Pool Administrator shall not be obligated to obtain individual Division or Transfer Orders from each owner, and the Pool Administrator shall not be under any further duty of inquiry as to the distribution or proper allocation of such proceeds. The Pool Administrator may rely upon the Pool Administrator's Division Orders or Transfer Orders or upon a title opinion furnished to it. Payments may be withheld without interest when there is:

i.      a dispute concerning title that would affect distribution of payments;

ii.     a reasonable doubt that the payee:

    (A)     has sold or authorized the sale of its share of the oil or gas to the purchaser of such production; or

    (B)     has clear title to the interest in the proceeds of production; or

Doc
00314935   Bk
OR   Vol
1236   Pg
15(

iii.    a requirement in a title opinion that places in issue the title, identity,

or whereabouts of the payee and that has not been satisfied by the payee after a

reasonable request for curative information has been made by the Pool Administrator.

The Pool Administrator's good faith determination of the amount of payment and proper

party to receive payment shall be conclusive, notwithstanding any notice or notice of claim

the Pool Administrator may have received, unless and until such notice is in the form of a

certified copy of a judicial proceeding contesting ownership.  Upon receipt of such notice,

the Pool Administrator's only obligation shall be to suspend the funds subject to the

controversy and still in the Pool Administrator's possession and control in a separate

suspense account, without interest, until the controversy is resolved, and the Pool

Administrator shall be without further liability as to the funds contested.

(d)    Distributions from the Compensatory Royalty Pool.  As more specifically

provided below, it is the general intent of this Agreement that distributions from the

Compensatory Royalty Pool be shared prorata by the owners of the mineral estate in Riparian

Tracts contiguous to the Agreed Riverbed as if such distributions were attributable to

production of oil and gas from the Riparian Tracts.  If a mineral interest in a Riparian Tract

is leased, the distributions shall be accounted for as if production occurred under the lease.

One-half of the distribution to each Riparian Tract shall be deemed attributable to oil

production and one-half of the distribution to each Riparian Tract shall be deemed

attributable to gas production.  The specific provisions of this paragraph 8(d) shall be

construed and applied to give effect to this general intent.  Exhibit E sets forth for each

Riparian Section the decimal share of the Compensatory Royalty Pool which shall be payable

to the Riparian Owners joining in this Agreement and owning an interest in that Riparian Section.

     i.    If 100% of the owners of the oil and gas in a particular Riparian Section join in this Agreement, then 100% of the decimal interest shown on Exhibit E as payable to the owners of that Section shall be paid prorata to those owners in accordance with their respective interests. If less than 100% of the owners of the oil and gas in a particular Riparian Section join in this Agreement, then the decimal interest shown on Exhibit E as payable to the owners of that Section shall be proportionately reduced and shall be payable to the persons or parties joining in this Agreement in accordance with their respective interests.

     ii.    If the owners of the oil and gas in a particular Riparian Section are subject to an oil and gas lease and 100% of the owners of the leasehold interest and 100% of the fee mineral owners of the oil and gas subject to the leasehold in that Section join in this Agreement, then 100% of the decimal interest shown on Exhibit E as payable to the owners of that section shall be paid to the owners of the leasehold estate in accordance with their respective interests. The leasehold owners shall in turn account for the distributions out of the Compensatory Royalty Pool as if such payments were attributable to production from the leasehold owners' lease(s). There shall be no distribution out of the Compensatory Royalty Pool attributable to leased minerals, except to the extent that both lessee and lessor (or other person or party holding the executive rights) join in this Agreement. If joinder is not complete as to the interests of lessor and lessee in any Section, then the decimal interest shown

Doc          Bk       Vol      Pg
00314935  OR      1236     152

on Exhibit E as payable to the owners of that section shall be proportionately reduced and shall be payable to the persons or parties joining in this Agreement in accordance with their respective interests. For example, if a leasehold owner owning 90% of the leasehold in a Riparian Section and a mineral owner owning 70% of the minerals subject to the lease in the same Riparian Section join herein, the distribution payable would be 70% X 90% X the Decimal Interest for that Riparian Section to the leasehold owner, and the leasehold owner in turn would account for the distribution out of the Compensatory Royalty Pool as if such payments were attributable to production from the leasehold owner's lease as to the interest of the joining lessor only.

      iii.     If there is more than one Riparian Tract within a Riparian Section, then, for purposes of allocating distributions of Compensatory Royalty among the Tracts within the Riparian Section, the Compensatory Royalty shall be allocated to each Riparian Tract in the same proportion as the length of the Centerline attributable to each Tract bears to the length of the Centerline attributable to the Riparian Section. The portion of the Centerline allocated to each Riparian Tract shall be determined by extending the boundary of each Riparian Tract to the Centerline, by a line parallel to the north-south lines of the original Riparian Section.

      iv.     To the extent that any Riparian Section is now or is hereafter divided into Tracts so that further allocation of that Riparian Section's share of the Compensatory Royalty Pool is required, the Riparian Owners in that Section shall at

Doc          Bk      Vol      Pg
00314935    OR      1236    153

their expense furnish to the Pool Administrator such additional surveys or

calculations as may be required for such allocation.

(e)    <u>Pool Administrator</u>.

iv.    <u>Designation and Responsibilities of Pool Administrator</u>.  Huber is

designated as the initial Pool Administrator for the Compensatory Royalty Pool. The

Pool Administrator shall conduct and direct and have full control of all operations

pertaining to the Compensatory Royalty Pool as permitted and required by, and

within the limits of this Agreement.  In its performance of services hereunder for the

persons and parties having an interest in the Compensatory Royalty Pool, the Pool

Administrator shall be an independent contractor not subject to the control or

direction of such persons or parties.  The Pool Administrator (in its capacity as

administrator of the Pool) shall not be deemed, or hold itself out as, the agent, trustee,

partner, or other fiduciary of such persons or parties with authority to bind them to

any obligation or liability assumed or incurred, or to any representation or admission

made, by the Pool Administrator to any third party.  The Pool administrator shall

conduct its activities under this Agreement as to the Compensatory Royalty Pool in

good faith, but in no event shall it have any liability as Pool Administrator to the

other parties to this Agreement or to the persons or parties having an interest in the

Compensatory royalty Pool for losses sustained or liabilities incurred, except such as

may result from the Pool Administrator's breach of this Agreement, fraud, gross

negligence, willful misconduct or intentional wrongdoing.  Without limiting the

foregoing, it is expressly agreed that there is no special relationship or relationship

Doc          Bk       Vol          Pg
00314935     OR       1236         154

of trust and confidence between the parties to this Agreement, and the Pool Administrator (in its capacity as administrator of the Pool) is not the agent, trustee, partner or other fiduciary of any party to this Agreement or to any person or party having an interest in the Compensatory Royalty Pool.

    v.    <u>Resignation or Removal of Pool Administrator.</u>    The Pool Administrator may resign at any time by giving written notice thereof to the State. If the Pool Administrator terminates its legal existence, no longer owns an interest in the Amended State Lease, or is no longer capable of serving as the Pool Administrator, the Pool Administrator shall be deemed to have resigned without any action by the State, except the selection of a successor. The Pool Administrator may be removed only for good cause by the State, after a written notice has been delivered to the Pool Administrator by the State detailing the alleged default, and after the Pool Administrator has failed to cure the default within 30 days from its receipt of the notice. For purposes hereof, "good cause" shall mean not only fraud, gross negligence, willful misconduct, or intentional wrongdoing, but also the material breach of or inability to meet the standards of operations contained in this Agreement or material failure or inability to perform its obligations under this Agreement as to the Compensatory Royalty Pool. Such resignation or removal shall not become effective until 7:00 a.m. on the first day of the calendar month following the expiration of 90 days after the giving of notice of resignation by the Pool Administrator or action by the State to remove the Pool Administrator, unless a successor Pool Administrator has been selected and assumed the duties of Pool

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS

Administrator at an earlier date. The Pool Administrator, after the effective date of

resignation or removal, shall be bound by the terms hereof the same as any other

party to this Agreement. A change of corporate name or structure of the Pool

Administrator or transfer of the Pool Administrator's interest to any single

subsidiary, affiliate, parent or successor corporation shall not be the basis for removal

of the Pool Administrator.

vi.    <u>Selection of Successor Pool Administrator</u>. Upon the resignation or

removal of the Pool Administrator under any provision of this Agreement, a

successor Pool Administrator shall be selected by the State. The successor Pool

Administrator shall be selected by the State from among the operators of oil and gas

wells on the Amended State Lease. Should the State fail or refuse to appoint a

successor Pool Administrator, any party to this Agreement may petition a court of

competent jurisdiction to appoint a Successor Pool Administrator. The former Pool

Administrator shall promptly deliver to the successor Pool Administrator all records,

data and funds relating to the Compensatory Royalty Pool and operations conducted

by the former Pool Administrator. Any reasonable cost of copying the former Pool

Administrator's records and data shall be borne by the former Pool Administrator.

vii.    <u>Effect of Bankruptcy</u>. If the Pool Administrator becomes insolvent,

bankrupt or is placed in receivership, it shall be deemed to have resigned without any

action by the State except the selection of a successor. If a petition for relief under

the federal bankruptcy laws is filed by or against the Pool Administrator, and the

removal of the Pool Administrator is prevented by the federal bankruptcy court, all

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                    Page 18

Doc                BK        Vol            Pg
00314935    OR        1236        156

other working interest owners under the Amended State Lease shall comprise an interim operating committee to serve until the Pool Administrator has elected to reject or assume this Agreement pursuant to the Bankruptcy Code, and an election to reject this Agreement by the Pool Administrator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Pool Administrator without any action by the State, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two or more parties owning a majority interest based on ownership in the Amended State Lease after excluding the interest of the bankrupt Pool Administrator. In the event there are only two parties to this Agreement, during the period of time the operating committee controls operations, a third party acceptable to the Pool Administrator, the State and the federal bankruptcy court shall be selected as a member of the operating committee, and all action shall require the approval of two members of the operating committee without regard for their interest in the Amended State Lease.

    viii.    Access to Records. The Pool Administrator shall, except as otherwise provided herein, permit each person or party having an interest in the Compensatory Royalty Pool or their duly authorized representative, at their sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the collection, management, and distribution of the Compensatory Royalty Pool and to the records of operations conducted therewith, including the Pool Administrator's books and records relating thereto. Such access

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                Page 19

Doc        Bk      Vol        Pg
00314935   OR      1236       157

rights shall not be exercised in any manner interfering with the Pool Administrator's other operations and shall not obligate the Pool Administrator to furnish any data other than reasonable accounting data and only if the cost of preparation and presentation of such data is charged to the person or party seeking the information and paid in advance. Any audit of the Pool Administrator's records relating to amounts collected, expended or distributed and the appropriateness of such collections, expenditures and distributions shall be conducted at the expense of the person or party requesting the audit.

    ix.   <u>Suit for Collection</u>. The Pool Administrator, at the Pool Administrator's election, shall have the right but not the duty to file suit or to take other steps reasonably calculated to lead to the collection of proceeds payable into the Compensatory Royalty Pool for the persons or parties having an interest therein, plus interest accruing on amounts recovered from the date of default to the date of collection. The Pool Administrator shall have the right to deduct from the sums collected and to reimburse the Pool Administrator for the reasonable costs of collection, to include, without limitation, attorney's fees, such sums not to exceed the amount collected.

    9.   <u>Limitations on Lease Rights and Obligations</u>. The State, and only the State, is the lessor under the Amended State Lease, and notwithstanding any other provisions of this Agreement (except for the right to share in proceeds as Compensatory Royalty and Excess Royalty if, as and when delivered to the Compensatory Royalty Pool), no other person or party has any rights as lessor under the Amended State Lease. Notwithstanding the division of the minerals covered by the

Amended State Lease into different tracts or interests, no such divisions shall impose any obligation upon the lessee under the Amended State Lease to drill or not to drill any well to further develop, explore, offset to prevent drainage, or for any other reason.

10.   Partial Release or Partial Termination of Amended State Lease. A partial release or partial termination of the Amended State Lease shall not affect the allocation of distributions from the Compensatory Royalty Pool. In the event that there is a partial release or partial termination of the Amended State Lease, the State Lessees and the State shall determine those easements, rights-of-way and access rights ("Continuing Access Rights") as are reasonably necessary for the State Lessees to continue to enjoy their continuing oil and gas rights in the Amended State Lease. Riparian Owners hereby grant to the State authority and consent to grant such Continuing Access Rights as are necessary for State Lessees to continue to enjoy their continuing oil and gas rights in the Amended State Lease. The Continuing Access Rights shall survive the partial release or termination of the Amended State Lease, shall be deemed appurtenant to the existing producing wells on the Amended State Lease, and shall continue for so long as they are used and reasonably necessary for the State Lessees' enjoyment of the mineral estate in any producing well. Upon abandonment of any Continuing Access Right for a term exceeding one year, the abandoned Continuing Access Right shall terminate, and the State Lessees shall from time to time place of record such partial releases as may be necessary to reflect such partial terminations.

11.   Riparian Owners' Interest in Minerals on Termination of Amended State Lease. If during the term of this Agreement the Amended State Lease is terminated or released as to lands adjacent to any Riparian Tract in which a Riparian Owner owns a mineral interest, then as to such released or terminated land (a "Released Tract") the Riparian Owner contiguous to the Agreed Bank

shall thereafter own a like percentage mineral interest (the same percentage ownership as in the Riparian Tract) in the Released Tract, subject to a 3.5% non-participating free royalty retained by the State. The areal extent of such ownership interest in the Released Tract shall be determined by a projection of the boundaries of the Riparian Tract contiguous to the Agreed Bank (parallel to the original north-south survey lines of the Riparian Section) to the Centerline of the lands originally covered by the Amended State Lease. The Riparian Owner's mineral interest shall be subject to and burdened by a non-participating royalty interest owned and hereby retained by the State equal to 3.5% of production, proportionately reduced by the percentage mineral interest acquired by the Riparian Owner in the Released Tract. The Riparian Owner's mineral interest in the Released Tract and the State's royalty interest therein shall remain in effect for the term of this Agreement. If, at the time of such partial release or partial termination, the Riparian Owner's mineral estate is already subject to an oil and gas or oil, gas and mineral lease, then such lease shall be deemed to cover and include the Riparian Owner's mineral interest in the Released Tract and the State's royalty interest therein. The State's 3.5% royalty interest shall be payable out of and deducted from the royalty specified in such lease. To the extent necessary to accomplish the purposes of this Agreement, the State hereby transfers to Riparian Owners a possibility of reverter in the lands subject to the Amended State Lease, subject to the reservation of royalty provided herein, and Riparian Owners hereby transfer to the State a royalty interest in the lands subject to the Amended State Lease, so that, upon termination of the Amended State Lease as to any lands adjacent to a Riparian Tract in which a Riparian Owner owns an interest, the Riparian Owner will own a mineral interest in the Released Tract, and the State will own a royalty interest therein.

**CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR**
**WESTERN HUTCHINSON COUNTY, TEXAS**                                                    Page 22

12.   <u>Ratification and Participation by other Mineral Owners</u>. The State, Huber , Jaten,

Morris, and each person or party joining this Agreement by way of ratification hereby offers to all

other owners of an interest in the mineral estate in the Agreed Riverbed and in Riparian Tracts the

option and right to join in this Agreement, upon the same terms and conditions, modified as follows:

(a)   <u>Effective Date of Ratification by Riparian Owners</u>. Any owner of an interest

in the mineral estate in Riparian Tracts contiguous to the lands covered by the Amended

State Lease who desires to join in this Agreement (a **"Ratifying Owner"**) may do so,

provided that such ratification must be fully and duly executed, acknowledged, delivered to

and accepted by the Pool Administrator prior to January 1, 2006. If a Ratifying Owner

executes and delivers a ratification to the Pool Administrator prior to January 1, 2005, such

ratification shall be effective, for purposes of such Ratifying Owner's participation in the

Compensatory Royalty Pool, as of the Effective Date. If a Ratifying Owner executes and

delivers a ratification to the Pool Administrator on or after January 1, 2005, then such

ratification shall be effective, for purposes of such Ratifying Owner's participation in the

Compensatory Royalty Pool, as of the first day of the year in which such Ratifying Owner's

ratification of this Agreement is delivered to and accepted by the Pool Administrator.

(b)   <u>Required Ratification by Ratifying Leasehold Owners</u>. If a Ratifying Owner

is an owner of an oil and gas interest in a Riparian Tract subject to an oil and gas lease, then

such Ratifying Owner's ratification shall only be effective to the extent that both lessee and

lessor (or other person or party holding the executive rights) join in this Agreement. That

is, the leasehold owner may commit its leasehold interest to this Agreement by ratification

with less than all of the mineral interest owners burdened by its leasehold interest, and the

**CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS**                                                 Page 23

mineral interest owner may commit its mineral interest to this Agreement by ratification with less than all of the leasehold owners burdening that mineral interest, but such ratifications shall be effective only to the extent of the joinder of both parties as a Ratifying Owner.

(c)    Effect of Ratification – Interests of State Lessees.    Ratification of this Agreement by a State Lessee shall be effective as of the first day of the month after the month during which such State Lessee delivers a properly executed ratification in the form of Exhibit H to the Pool Administrator, provided that such ratification must be fully and duly executed, acknowledged, delivered to and accepted by the Pool Administrator prior to January 1, 2006. From and after the effective date of a State Lessee's ratification of this Agreement, such State Lessee shall pay its share of Compensatory Royalty and Excess Royalty on production from its wells on the Amended State Lease to the Pool Administrator. If a State Lessee ratifies this Agreement prior to January 1, 2005, then the Excess Royalty payable by such State Lessee shall be as provided in paragraph 6 above. If a State Lessee ratifies this Agreement on or after January 1, 2005 but prior to January 1, 2006, then the Excess Royalty payable by such State Lessee shall be the percentage set forth in paragraph 6 above *plus two percent (2%)*. Huber and any State Lessee ratifying this agreement hereby grant, bargain, sell and convey each to the other so much of their interest in the Amended State Lease as may be necessary so that each of them shall hereafter own an interest in the Amended State Lease that corresponds to their interest in State Lease A and State Lease B as of January 1, 2002, as to the lands described in the Amended State Lease, and those persons and parties together with Huber covenant and agree to give such further assurances as may be reasonably necessary to evidence their interests of record.

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                                Page 24

Doc          Bk      Vol      Pg
00314935     OR      1236     162

(d) <u>Effect of Ratification on Settlement of Claims</u>. Each Riparian Owner or State Lessee ratifying this Agreement joins in this Agreement for all purposes and shall be bound hereby as to all terms and provisions hereof, including, without limitation, the provisions regarding release and settlement of Claims.

(e) <u>Procedure for Ratification</u>. Any Riparian Owner or State Lessee desiring to ratify and join in this Agreement shall execute a "**Ratification**" in the form attached hereto as **Exhibit H**, describing such owner's interest in the Agreed Riverbed or in one or more Riparian Tracts, and shall submit such Ratification to the Pool Administrator together with a $25 recording and handling fee payable to the Pool Administrator. If such Ratification satisfies the requirements of this Agreement, the Pool Administrator and the State shall execute the Ratification and the Pool Administrator shall record such document in the Real Property Records of Hutchinson County. This Agreement and all subsequent Ratifications shall be treated as a single Agreement, and by joining herein, each party, whether an original signatory party or a ratifying party, agrees to be bound as to every other party joining herein. After the time specified for acceptance herein, the continuing offer to settle and compromise shall be deemed withdrawn as to all persons and parties not timely joining herein. As to all such persons or parties failing or refusing to timely join herein, this Agreement shall be of no force and effect, and no such person or party shall be deemed a third party beneficiary of this Agreement. The requirement of timely joinder may be waived, but only by an express written waiver executed by both the State and the Pool Administrator on the Ratification.

13. <u>Compromise and Settlement of All Claims</u>. For purposes of this Agreement, the term "**Claims**" shall mean all rights or actions which any party hereto may have or allege to have against

**CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR**
**WESTERN HUTCHINSON COUNTY, TEXAS**                                      Page 25

any other party hereto based on all conduct, whether statements, acts or omissions, of the released

party or parties pertaining or relating to the boundary of their mineral estates between the bed of the

River and the lands adjacent to the River. The term "Claims" includes any right or cause of action

for past production of oil or gas from the lands described in the Riverbed Leases or the Amended

State Lease and any right or cause of action for use of or damages to the surface estate of lands

described in the Amended State Leases attributable to oil and gas operations thereon which accrues

before the Effective Date, together with any right to attorney's fees and costs, whether the right,

alleged right or conduct is known or unknown, whether the right or alleged right arises under

common law, equity, tort, violation of any statute, or any contract or implied contract. Expressly

excluded from the meaning of the term "Claims" are (1) any dispute as to the boundary of the surface

estate of the bed of the River, (2) any criminal, civil, and/or administrative enforcement proceeding

(unrelated to the location of the River within the lands included in the Amended State Lease) that

the State may bring against any person for criminal sanctions, civil penalties, administrative

penalties, injunctive relief, enforcement of administrative relief, and/or attorney fees and

investigation costs incurred in connection with any of them; (3) claims by the State that are not

within the enforcement authority of the General Land Office of the State of Texas; (4) claims by the

State for unpaid or late paid taxes, fees, or penalties; and (5) interest on any of the above matters (1) -

(4) and costs and attorney fees in connection with such proceedings. It is the intent of the parties

hereto to compromise and settle the Claims, and to release the other parties hereto from all further

liability as to the Claims. Therefore:

    (a)   <u>Release of State Lessees</u>. For the consideration of the mutual execution of

this Agreement and the execution and delivery of the instruments attached hereto as exhibits

(insofar as may be required by this Agreement) and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the State and Riparian Owners do hereby RELEASE and FOREVER DISCHARGE State Lessees, and State Lessees' officers, directors, members, managers, partners, employees, attorneys, agents, heirs, personal representatives, predecessors, successors, and assigns, and all persons, firms or corporations in privity with them or any of them, of and from any and all liability, actions, claims, demands or suits whatsoever that the State and Riparian Owners may now have on account of or in any manner arising out of or attributable to the Claims.

(b)    Release of Riparian Owners.  For the consideration of the mutual execution of this Agreement, the execution and delivery of the instruments attached hereto as exhibits (insofar as may be required by this Agreement) and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the State and State Lessees do hereby RELEASE and FOREVER DISCHARGE Riparian Owners and Riparian Owners' officers, directors, members, managers, partners, employees, attorneys, agents, heirs, personal representatives, predecessors, successors, and assigns, and all persons, firms or corporations in privity with them or any of them, of and from any and all liability, actions, claims, demands or suits whatsoever that the State and State Lessees may now have on account of or in any manner arising out of or attributable to the Claims.

(c)    Release of the State.  For the consideration of the mutual execution of this Agreement and the execution and delivery of the instruments attached hereto as exhibits (insofar as may be required by this Agreement) and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Riparian Owners and State Lessees do

hereby RELEASE and FOREVER DISCHARGE the State, and the State's agencies, officers, employees, attorneys, agents, predecessors, successors, and assigns, and all persons, firms or corporations in privity with them or any of them, of and from any and all liability, actions, claims, demands or suits whatsoever that Riparian Owners and State Lessees may now have on account of or in any manner arising out of or attributable to the Claims.

It is not the intent of the parties hereto to compromise or settle any matter or issue pertaining or relating to the location of the boundary of the River, except as between the parties hereto. Nothing herein expressed shall be considered as an admission against interest, a waiver, or an expression of intent by any party hereto as to any other person or party, not a party to this Agreement, as this entire Agreement is a compromise of disputed facts and circumstances. Any person or party joining in this Agreement who is also a party to any pending litigation involving the location of the boundary of the River (including, without limitation, *Riemer, et al. v. The State of Texas, et al.*, Cause No. 30,441 in the 84th District Court in Hutchinson County, Texas) and claiming adversely to any other party to this Agreement covenants and agrees to promptly execute, file and obtain such motions, pleadings and orders as may be necessary to dismiss all such claims against parties to this Agreement, except any dispute as to the boundary of the surface estate of the bed of the River.

14.    <u>Representations, Warranties and Denial of Liability</u>.    For the same mutual consideration, the parties hereto further REPRESENT and WARRANT to each other that no promise or agreement not herein expressed has been made by any party hereto, or any person or party purporting to represent any party hereto; that this Agreement is not executed in reliance upon any statement or representation made by the parties hereto, concerning anything or any matter; that the above-mentioned consideration is accepted in full compromise, settlement, accord and satisfaction

of any and all claims of whatsoever kind or nature now existing, including all consequences thereof

which hereafter develop, as well as those already developed or now apparent arising out of or in

connection with the Claims; and that the consideration herein expressed is solely a compromise and

settlement of disputed claims and is not to be construed as an admission of liability, all liability being

expressly hereby denied.

15.    Binding Effect, Choice of Law and Venue.    This Agreement shall be binding upon

the parties hereto, their heirs, personal representatives, successors and assigns. This Agreement and

all of the transactions contemplated herein shall be governed by and construed in accordance with

the laws of the State of Texas, and venue for the construction, interpretation or enforcement of this

Agreement shall be in Travis County, Texas or Hutchinson County, Texas.

16.    Knowledge and Full Agreement.    The parties hereto represent that they have carefully

read this Agreement and know the contents thereof and have executed or ratified this Agreement of

their own free will and volition. This Agreement is stipulated by the parties to have been jointly

negotiated and drafted and that it fully and completely sets forth the terms of the parties' agreement.

The parties further stipulate and agree that (1) prior drafts of this Agreement, (2) any paragraph,

term, or provision, contained in or deleted from such prior drafts, and (3) any paragraph, term, or

provision proposed by any party to be included in or deleted from a prior draft, are irrelevant and

shall be inadmissible as evidence in any proceeding for the purpose of proving the terms of this

Agreement or the intention of the parties to this Agreement.

17.    Headings for Convenience.    The paragraph headings herein are for convenience only

and will not be considered or construed to limit the subject matter of any paragraph.

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS                                                 Page 29

Doc
00314935
Bk
OR
Vol
1236
Pg
16.

EXECUTED to be effective as of January 1, 2002.

BROWN & FORTUNATO, P.C.
905 S. Fillmore, Suite 400 (79105)
P.O. Box 9418
Amarillo, TX 79101-9418
(806) 345-6300 Telephone
(806) 345-6363 Facsimile

By: _____
Richard F. Brown
State Bar No. 03162450

J.M. HUBER CORPORATION

By: _____
Robert Cornelius
Vice President, Panhandle Area

ATTORNEYS FOR J.M. HUBER CORPORATION

SandersBaker, P.C.
P.O. Box 2667
Amarillo, TX 79105-2667
(806) 372-2020 Telephone
(806) 372-3725 Facsimile

By: _____
Edward Morris
State Bar No. 14477500

JATEN OIL COMPANY

By: _____
Marvin Webb
President

ATTORNEYS FOR JATEN OIL COMPANY

_____
EDWARD L. MORRIS

Doc         Bk      Vol      Pg
00314935    OR      1236     168

Graves, Dougherty, Hearon & Moody
515 Congress Avenue, Suite 2300
Austin, TX 78701
(512) 480-5600 Telephone
(512) 478-1976 Facsimile

The STATE OF TEXAS on behalf of the
PERMANENT SCHOOL FUND

By: _____
    Jerry E. Patterson, Commissioner
    Texas General Land Office and
    Chairman of the School Land Board

By: _____
    John B. McFarland
    State Bar No. 13598500

ATTORNEYS FOR THE STATE OF TEXAS

STATE OF TEXAS              §
                           §
COUNTY OF POTTER           §

This instrument was acknowledged before me on this 14th day of January, 2004, by Robert Cornelius, Vice President, Panhandle Area, of J.M. Huber Corporation, a Texas corporation, on behalf of said corporation.

[Notary seal: Nora R Huelster / My Commission Expires / August 03, 2005]

_____
Notary Public, State of Texas

STATE OF TEXAS              §
                           §
COUNTY OF Potter           §

This instrument was acknowledged before me on this 14th day of January, 2004, by Marvin Webb, President of Jaten Oil Company, a Texas corporation, on behalf of said corporation.

[Notary seal: Nora R Huelster / My Commission Expires / August 03, 2005]

_____
Notary Public, State of Texas

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS

Page 31

235

Doc          Bk      Vol      Pg
00314935     OR      1236     169

STATE OF TEXAS                    §
                                  §
COUNTY OF Potter                  §

This instrument was acknowledged before me on this 14th day of January, 2004, by Edward L. Morris.



Nora R Huelster
My Commission Expires
August 03, 2005

_Nora A. Huelster_
Notary Public, State of Texas


STATE OF TEXAS                    §
                                  §
COUNTY OF Travis                  §

This instrument was acknowledged before me on this 1 day of JUNE, 2004, by Jerry E. Patterson, as Commissioner of the Texas General Land Office and Chairman of the School Land Board.



Stacy Bryant
Notary Public
State of Texas
My Commission Expires
APRIL 07, 2007

Notary Public, State of Texas

\\serve7\documents\01\1283,0073\Settlement FINAL.wpd                    REVISED January 14, 2004

CANADIAN RIVER MINERAL BOUNDARY AGREEMENT FOR
WESTERN HUTCHINSON COUNTY, TEXAS

Page 32